GRAY, Executrix of GRAY, *against* J. B. MURRAY.

*October 8, and December 13.*

*G.* was engaged by *M.* as a supercargo of a ship, on a trading voyage from *New-York* to *Madeira,* the *Cape of Good Hope, Madras,* and *Calcutta,* and thence back to *New-York;* by the written instructions to *G.,* by which much was confided to his judgment and discretion, he was to receive as a compensation for transacting the business, *two and a half per cent.* of the value of the property brought home for the account of *M.,* arising from the proceeds of the outward cargo, deducting duties, &c, and to have his reasonable expenses, while on the voyage, paid out of the cargo; and to be allowed, also, *five per cent.* or one twentieth part of the nett profits, on its termination. *G.* performed his duty from *New-York* to *Madeira* and to the *Cape of Good Hope,* but was taken sick at the latter place, and obliged to leave the ship, and died on his return homeward in another vessel; having first appointed at the *Cape, B.* and *B.* (one of whom had been a clerk of *M.* and particularly recommended to *G.'s* attention,) his substitutes, as supercargoes for the remainder of the voyage, agreeing to pay them for their services, out of his commissions. The ship proceeded to *Madras,* and from thence returned to *New-York,* where the homeward cargo was delivered to *M.,* who cleared a considerable profit on the voyage, *B.* and *B.* having faithfully performed their duty as supercargoes in the place of *G.* It was held, that the legal representatives of *G.* was entitled to the full compensation stipulated, as for the completion of the voyage.

Where *G.,* being about to depart from *New-York* on a voyage to the *East Indies,* gave an order for *insurance on his life,* to the amount of 3,000 pounds sterling, which was accepted by the insurance company in *London,* and the agents of *M.* who undertook to complete the business, paid the premium for one year, and received the policy for that amount, to continue for 10 years, at the election of *G.* But *M.* afterwards, alleging that there was a mistake, without the knowledge or consent of *G.* procured this policy to be cancelled by the insurers, and another policy to be executed by them for 450 pounds, the difference of premium being refunded by the insurers. It was held that *M.* by thus procuring a valid and existing contract of insurance to be cancelled, substituted himself for the insurers, and was answerable to the legal representative of *G.,* who died within a year, for the amount insured by the original policy, after deducting the premium.

BILL, filed 12th of *July,* 1811, stating, that in *June* 1807, the defendant, being owner of the ship *Egeria,* and having loaded her for a trading voyage from *New-York* to *Madeira,* from thence to the *Cape of Good Hope,* thence to *Madras,* thence to *Calcutta,* and from thence back to *New-York,* he hired the plaintiff's testator, to go as

*supercargo* on the voyage, and by his *letter of instructions*, dated the 27th of *June*, 1807, he instructed the testator, that the voyage was undertaken, in consequence of a contract made by the defendant, with the house of *Phelps, Page & Co.* in *Madeira*, by which he was to ship a cargo, chiefly provisions, to them, and to receive there a cargo of 400 pipes of wine; that after the testator had received on board the cargo of wine, he was to proceed with it to *Calcutta*, touching first at the *Cape of Good Hope*, and there dispose of as much of the wine as he could, at the prices to be authorized by *P. P. & Co.* That he was next to stop at *Madras*, and there, if he could, make further sales of the cargo. That his outward voyage was to terminate at *Calcutta ;* and from thence to return to *New-York*, with the investment of the outward cargo. That the defendant, in his said instructions, stipulated to allow and pay the testator, *two* and a *half* per cent. on the proceeds of the return cargo at *New-York*, and *five* per cent. or one equal *twentieth* part of the clear profits of the voyage, upon the arrival of the ship at *New-York*. That the testator sailed on the voyage described, as supercargo, in *June*, 1807, and proceeded to *Madeira*, where he placed the outward cargo in the hands of *P. P. & Co.*, and received on board a cargo of wines. That in consequence of his great exertions and trouble, his health became impaired, and *P. P. & Co.*, in consequence of the testator's exertions, were induced to allow him, out of their own separate funds, two and a half per cent. on the sale of the wines shipped. That proceeding on the voyage, the testator touched at the *Cape of Good Hope*, for the purpose of selling part of the cargo, if found advisable. That the master of the ship, a man addicted to liquor, and of bad passions, gave information that the ship was engaged in some improper trade, in consequence of which she was seized and detained there nine weeks. That the health of the testator, from constant anxiety and fatigue, became

Worse; and being, in consequence, unable to pursue the voyage, he exhibited, his instructions to *James C. Baehr* and *John Bryan*, (the former of whom had been brought up in the counting house of the defendant, and went out on the voyage, and the latter a gentleman of acknowledged ability and integrity, whom he met with there,) and appointed them to act in his place, as supercargoes, giving them a copy of his instructions, and engaging to pay them a specific sum for their services out of his own commissions upon the voyage. That the ship proceeded on her voyage to *Madras*, where the residue of the wines were sold. That on the arrival of the ship at *Madras*, it was currently reported and believed, that a rupture had taken place between *Great Britain* and the *United States ;* and the supercargoes so substituted, after consulting their friends, deemed it imprudent to proceed to *Calcutta*, and that it would be most for the interest of all concerned, to return direct to *New-York*, where they arrived, accordingly, in *December*, 1808. That the commissions upon the sales of wines, so allowed the testator by *P. P. & Co.*, amounted to 1,238 dollars, 34 cents, and were invested by *B.* and *B.* in *India* goods, on account of the testator. That the return cargo was sold at *New-York*, for above 90,000 dollars, and the profits of the voyage to the defendant amounted to above 40,000 dollars. That the defendant was perfectly satisfied with the conduct of the testator while he acted as supercargo, and with that of his substitutes *B.* and *B.* That soon after the departure of the ship from the *Cape of Good Hope*, the testator embarked for *Boston*, and died on the passage, having made his will, and appointed the plaintiff, *Robert Hamilton* of *Baltimore*, and *George W. Murray*, of *New-York*, his executors; that the two latter having renounced the appointment, the plaintiff became the sole acting executrix. That the testator was at considerable charge and expense, while in the service of the defendant, as supercargo, before em-

barking, and during the voyage, and paid large sums on his account, the particulars of which were stated in a schedule annexed. That the testator never received any part of the compensation agreed to be paid to him by the defendant, except some trifling sums.

That the testator, before he sailed from *New-York*, by an application in writing to the *Pelican Life Insurance Company* of *London*, procured an *insurance on his life*, for the sum of 3,000 pounds sterling for one year; that the premium was paid by the testator, and the policy, duly executed by the company and binding on them, was transmitted to the defendant, who pretending that the policy was cancelled soon after it was made, and in the life time of the testator, withholds it from the plaintiff, and refuses to account for the money due thereon, in consequence of the death of the testator within the year. That if the policy has been cancelled, it has been by the defendant, without any authority, and without the knowledge or consent of the testator. That the defendant refuses to reimburse the moneys paid, laid out, and expended for him by the testator, and his expenses, and refuses to make the compensation for his services, or to pay the plaintiff the proceeds of the investment of the commissions allowed him by *P. P. & Co.*, or to deliver up the policy of insurance, &c.

Prayer for an account, &c., and that the defendant deliver up the policy, or if cancelled, to pay to the plaintiff the amount of the sum insured, with interest from the death of the testator; and for general relief.

In *January*, 1812, the defendant *demurred* to so much of the bill as sought compensation for services subsequent to the testator's leaving the ship, and commissions on sales, if any, of the cargo, and as sought an account of the *proceeds* of the cargo, or commissions, or for the sale of wines under any contract with *P. P. & Co.*, and payment for money advanced by the testator before the voyage, &c.

The *answer* of the defendant to the residue of the bill denied, that the testator had any *discretionary* power as to the ship or voyage, beyond his instructions, dated the 27th of *June*, 1807, which were set forth. The answer stated, that the testator's health was indifferent when he sailed from *New-York ;* that he was of an irritable temper, and the ship was seized at the *Cape of Good Hope*, in consequence of his indiscretion in quarrelling with the captain, &c.; that the testator quitted the service of the defendant at the *Cape,* in consequence of illness, and died on his return to the *United States.* That *J. C. Baehr*, went out as an assistant at his own request, and without compensation; that the testator committed the charge of the defendant's business and concerns to *Baehr* and *Bryan,* for which he was to pay a specific sum for their services; and that the substitution was made without the knowledge or consent of the defendant. The defendant set forth, in a schedule annexed, all the expenses and costs incurred by the testator on his account. The defendant further stated, that from the testator's bad health, he doubted of his life, and wished to be indemnified for his advances on account of the testator, by an insurance on his life. That he suggested it to the testator, and understood from him that he had applied to the agent of the *London Pelican Office*, in *New-York.* That the defendant, on the 15th of *July*, 1807, wrote to his agents, *T. Mullet & Co.* at *London.* In this letter, he stated, that he had written to them, on the first instant, requesting them to effect insurance on the supercargo's commissions, for the ship *Egeria,* in order to secure the defendant, for advances to him ; and as further guaranty, the testator had made application to the *London P. Ins. Company* in *New-York*, for insurance on his life for the voyage; that they had sent the application to the secretary of the company in *London ;* and he begs his correspondents to call at the office and complete the business, taking into their hands the policy, and adjusting

Vol. III. 23

1817.

GRAY
v.
MURRAY.

the premium, and charge it to the defendant's account. That on the 7th of *November*, 1807, and before the defendant received an answer to this letter, he went, with *George W. Murray*, to the agent of the *Pelican Insurance Company* in *New-York*, and found that the plaintiff had applied to insure 3,000 pounds sterling, on his life, which application had been forwarded to *London*, and an answer returned to the agent here. That not knowing that the testator had any other object in the insurance, than the indemnity of the defendant, and considering the premium high, he advised with *G. W. M.* as the particular friend of the testator, and considering it would be more for the interest of the testator, he, with the advice of *G. W. M.*, concluded to effect an insurance for 2,000 dollars, and drew on *London* for 36*l.* 6*s.* 3*d.* sterling, the premium for one year, and wrote, the same day, to his correspondents in *London*, stating, that the agent at *New-York* of the *Pelican Insurance Company*, had received instructions from his office to receive the premium as fixed by them, and that they would take the risk at 8*l.* 4*s.* 5*d.* per cent. That the defendant had directed 450*l.* to be insured, and had paid 37*l.* 4*s.* 10*d.* sterling. That they would hold that policy, and the one on the commissions of the testator, and in case of loss, to recover the same for the defendant. That on the 13th of *November*, 1807, the defendant wrote to the plaintiff, enclosing a copy of a reply from the *London Pelican Insurance Company*, to the application of the testator; and stating, that on the receipt of it, he had paid the premium on 450*l.* or 2,000 dollars being 167 dollars, four cents, and had instructed his correspondents in *London*, to receive the policy. That pursuant to instructions from the testator, the defendant had procured to be insured in *London* 600*l.* sterling on his *commissions*, and, by an agreement with the testator, the defendant was to have those policies, as a security for his advances, which were not to exceed 250 dollars per quarter; that the amount of

the premium was part of that advance, and ought to be deducted from the advances to the plaintiff.

That on the 17th of *November*, 1807, the defendant received from his agents in *London*, a letter dated the 11th of *September*, 1807, stating that they had called on the *Pelican Insurance Company*, and were informed by the secretary, that the testator had proposed an insurance on his life, for 10 years, to the amount of 3,000 pounds, that the directors had accepted the risk, and they had paid the premium for the first year, being 254*l.* 5*s.* which they had charged to the defendant. That the policy was not then signed, as the board were not to meet for several days. On the 19th of *November*, 1807, the defendant wrote again to his agents in *London*, acknowledging the receipt of their letter of the 14th of *September*, covering the copy of the policy on the testator's commissions, and mentioning the insurance on his life for 3,000*l.* sterling, &c. That it was a *mistake* as they could see by the letter from the agent of the company to the secretary; that the premium was to be returned *in toto*, and no further sum to be continued, than 450*l.* sterling, on which the defendant had paid the premium.

That on the 10th of *December*, 1807, the defendant again wrote to the plaintiff, stating that he had received from his correspondents in *London*, a copy of the policy on the testator's commissions; that they informed him that they had received from the *Pelican Life Insurance Company*, a policy on the testator's life for one year, from the 1st of *July*, to the amount of 3,000 pounds sterling, and had paid the premium thereon to 246*l.* 15*s.* sterling, and charged one quarter per cent. commissions, for effecting the same, making 253*l.* 5*s.* sterling, or 1,125 dollars, 55 cents; that this insurance must have arisen from mistaking the amount proposed by the testator to be sterling, instead of dollars; besides, the defendant says, he understood that the testator only contemplated insuring 2,500 dollars, and as the premiums were, in the defendant's opi-

nion, very high, and 2,000 dollars would cover his advances, he took the liberty of acting as he thought best for the testator's interest, and limited the sum to 2,000 dollars, on which he had paid the premium, and had forwarded a letter from the company's agent, directing the first policy to be cancelled, and the premium to be returned. That taking it for granted that the first policy was cancelled, without expense, the actual amount paid by him for premiums, was 411 dollars, 14 cents, and which was to be deducted in parcels from each quarter's advance to the plaintiff. That on the 15th of *February*, 1808, the defendant received a letter from his agents in *London*, dated the 22d of *December*, 1807, in which they wrote, in regard to the insurance, " Your draft in favour of *Jenkin Jones*, has been honoured ; but it is rather singular, that in your previous correspondence, you have not stated a word about the sum," and, from the representation made, they now suppose, that dollars had been mistaken for pounds, and the present life insurance is only 450 pounds ; that the office had very properly offered to cancel the former policy and return the premium, but they add, as in the course of another month, they expected to hear from the defendant, decisively, in answer to their letter of the 11th of *September*, which spoke of the insurance, they think it better to leave it until then. Meantime, as the office disliked an insurance of more than 3,000 pounds on one life, they waive the insurance now offered and paid for, till the policy for 3,000 pounds was cancelled. That the defendant, in his letter of the 15th of *July*, desired them to pay the premium and receive the policy, but the sum had neither then nor since, been mentioned, until the 450 pounds now, so that they had no means before, of pointing out the error to the office.

The defendant, in his answer, further stated, that having, through his agents, obtained a return of the premium of insurance, he wrote the plaintiff, on the 3d of

*March*, 1808, mentioning that the first policy on the life of the testator, for 3,000 pounds sterling, had been cancelled, and that he had received the last policy for 450 pounds, or 2,000 dollars, for one year, from the first of *July*, with the privilege of renewal, yearly for nine years longer, and that as it was not probable that the testator could return by the end of the first year, he should, in due time, order a continuance.

The *demurrer* was argued and overruled in *October*, 1814; and in *May*, 1815, the defendant put in another answer, setting forth at length, the correspondence which had led to the appointment of the testator, supercargo of the *Egeria*, as the letter of instructions and a history of the voyage, and the agreement with *P. P. & Co.* That the commissions of two and a half per cent. stipulated by them to be allowed the testator for his commissions on the sales of the wines, were to be for the benefit of the defendant, not the testator. The defendant admitted that the voyage of the *Egeria* yielded a profit, but the profit would have been much greater, had his instructions been followed and executed with due discretion, and the voyage pursued to *Calcutta ;* and the defendant insisted, that the plaintiff was not entitled to any compensation for services rendered by the substitutes of the testator, nor for commissions on the sales of the wines, nor on the profits of the voyage, and that the defendant was not bound to disclose the proceeds of the cargoes. He admitted, that he might have expressed an unqualified approbation of the testator's conduct, and of that of his substitutes, *B.* and *B.*, as being governed by their best judgment; but that he was dissatisfied with the testator's conduct, and that any expresions of approbation thereof he may have used, must have been used before he was made fully acquainted with it, and under misapprehension or ignorance of the character and circumstances of it. He denied that the agreement with the testator had been so substantially performed on his part, as to entitle him,

1817.

GRAY
v
MURRAY.

or any other person, to receive any compensation for what had been done.

That goods shipped from *Madras*, on account and risk of the testator, had been received and were delivered to *George W. Murray*, as his agent; that the defendant had discovered that the proceeds of the wine, to the amount of 1,238 dollars and 34 cents, had been applied to the purchase of those goods, as being commissions which the testator claimed under a contract with *P. P. & Co.*; but that such commissions constituted a part of the defendant's profits, and that the plaintiff was, therefore, accountable for that sum. That to indemnify the defendant for his advances to Mrs. *G.*, and as the death of the testator might prevent his earning the commissions, it was proposed by the defendant, and agreed to by the testator, that the testator's life should be insured for the defendant's security. That the cancelling of the policy for 3,000 pounds had been ratified and approved by the plaintiff and *George W. Murray*. That the defendant is willing to account with the plaintiff, excluding any claim for *compensation* for services by the testator, as *supercargo*, and is willing to credit the plaintiff with the nett proceeds of the insurance for 450 pounds sterling.

It is unnecessary to detail the evidence taken in the cause. The facts not admitted by the pleadings, are, in substance, stated in the opinion delivered by the Court.

The cause was brought to a hearing on the 8th of *October* last.

*Wells* and *B. Robinson*, for the plaintiff.

*S. Jones, jun.* and *D. B. Ogden*, for the defendant.

*December*, 13.

The cause stood over for consideration until this day, when the following opinion was delivered by his Honour:

THE CHANCELLOR. 1. The first question is, whether the plaintiff is not entitled to recover the stipulated compensation which her husband was to receive, on the completion of the voyage, for his services as supercargo.

The instructions under the hand of the defendant stated, that the testator was to receive for transacting the contemplated business, two and a half per cent. of the value of all property brought home for the account of the defendant, arising from the proceeds of the outward cargo, after deducting the duties and other expenses, &c. That he was to have his reasonable expenses, while on the voyage, paid out of the cargo; and that he was to have a share of five per cent., or one twentieth part of the nett profits of the voyage, at its termination.

It is contended, that the services were substantially and beneficially rendered by the supercargo and his substituted agents, and that these services received the approbation of the defendant.

It is admitted, that the voyage was successful and yielded a profit, though the defendant will not disclose the amount of the profits. The answer says, that the defendant may have expressed his approbation of the conduct of the substitutes; and a witness heard him acknowledge, after the return of the ship, that the testator had acted as well as he could under the circumstances, and that the conduct of the substitutes was satisfactory.

There are other circumstances from which we may infer the defendant's admission that the commissions were due, though the supercargo had left the ship at the *Cape of Good Hope.* Thus, in the defendant's account current, annexed to his answer, he adds, on the credit side, of the date of the 29th of *September,* 1808, when he had received information of Mr. *Gray's* death, "By prem. on 2,000 dollars, *Bryan* and *Baehr* com. charged, *they being to receive so much out of Mr. Gray's com.*"

The defendant, at that time, knew of the substitution.

1817.

GRAY
v.
MURRAY.

and evidently approved of it. So, also, it appears, that shortly after the return of the *Egeria*, he told a witness that he had sold the pepper at a handsome profit, *and which was to the advantage of the testator, or his widow.*

The conduct of the testator, from the commencement of the voyage, until he was obliged to retire, from extreme sickness, was faithful and judicious, and the equity of the claim on the part of the plaintiff is striking and impressive. There was great confidence reposed in the supercargo, and an enlarged discretion given him by the instructions. He was recommended to govern himself at *Calcutta*, by information he might collect there, as to the expediency of a voyage to *Batavia*. He was authorized to send the ship even to *Canton* or *Manilla*, and was recommended to substitute *Baehr* for himself, as to such secondary voyage, and *Baehr* was very specially recommended to his attention and confidence. He was instructed to select another house, in the hands of which he was to place the outward cargo, in case he should find the house of *Phelps, Page, & Co.* unsafe, and all disbursements by the captain or otherwise, were to be approved of by him, exclusively.

Under all this power and confidence, the supercargo acquitted himself with judgment and probity, and it was not the least evidence of it, that he should have selected this very Mr. *Baehr* as one of the substitutes to whom he transferred his trust. *Baehr* and *Bryan* were appointed by him to act in his place, as supercargoes, and they accepted the duty, and promised to perform it, for a compensation to be paid by him out of his commissions. They did perform the trust, and to the approbation and benefit of the defendant. It would appear to be unreasonable and unjust,

G. was engaged by M., the owner of a ship, as supercargo, on a trading voyage, and was to receive as a compensation of his services, two and a half per cent. on the proceeds of the outward cargo, and five per cent. or one twentieth of the nett profits of the voyage, on its termination. He fell sick, during the outward voyage, and left the ship, having appointed another supercargo in his place for the residue of the voyage, and agreed to pay him out of his own commissions. It was held, that the legal representatives of G., who died on his return home, were entitled to the full compensation stipulated, the ship having successfully performed the voyage, and which produced a large profit to M., and the substitute of G. having faithfully performed his duty, as supercargo.

that the defendant should receive these beneficial services of the testator and his substitutes, *gratis.* The testator was prevented, by the act of God, from rendering all the services of the voyage in his proper person. I am aware that the common law was harsh on this point; but I cannot believe there is any such principle either in the marine law, or in the law of this court.

The general rule of the common law is, that if a contract be undertaken, and partly, but not entirely, performed, the party cannot recover his wages or hire, as for a partial performance of it, *pro rata.* (*Countess of Plymouth* v. *Throgmorton*, 1 *Salk.* 65.) Thus, in *Cutter* v. *Powell*, (6 *Term Rep.* 320.) the defendant gave a note, promising to pay the plaintiff's intestate, 30 guineas, provided he proceeded, continued, and did his duty, as second mate in the ship, on a voyage from *Kingston* to *Liverpool.* The intestate entered on the voyage, did part of the service, and died on the passage. It was held by the K. B. that the plaintiff was not entitled to recover either upon a *quantum meruit*, because the express contract did away all implied ones, or upon the express contract, because it was not fulfilled. The performance was a condition precedent, and it was an entire contract. But in this very case light breaks in from another quarter, to console us for the severity of the doctrine. If the party hired, wilfully or voluntarily abandons his contract, after a part performance, as in *M'Millan* v. *Vanderlip*, and *Jennings* v. *Camp*, (12 *Johns. Rep.* 165. 13 *Johns. Rep.* 94.) there is equity in denying him a rateable compensation; but we are speaking of cases in which the party was prevented from an entire performance, by the act of God; and in the cases cited from the *Term Reports*, the court admitted, that if the *commercial usage* had been to recover in such case rateably, that usage would have controlled their opinion. The old rule was, that if a servant agreed to re-

ceive large wages, on condition of serving a whole year, and he died in the middle of the year, his representatives recovered nothing. But it was admitted, in that case, that they now recover proportionably, because the servant is understood to be hired, with reference to *the general understanding on this subject,* which is, that he shall be entitled to rateable wages, though he be disabled from serving the whole year.

In *Chandler* v. *Grieves,* (2 *H. Black.* 606. *note.*) it was certified to the C. B. to be the admiralty usage, that if a seaman be disabled in the course of the voyage, he was entitled to wages for the whole voyage, though he had not performed the whole. But, Mr. *Abbott,* (*Treatise on Shipping.* p. 355, 356.) says, there is no general decision on the subject in our law books; and that in certain foreign ordinances, to which he refers, it is not clear whether the payment of seamen's wages, on the death of a seaman during a voyage, is to be understood of a sum proportionable to the time of his service, or of the whole sum that would have been earned, if he had lived to the end of his voyage.

In *Sims* v. *Adm. of Jackson,* (1 *Peters' Adm.* 157.) it was decided in the Circuit Court of the *United States,* for *Pennsylvania,* that full wages for the entire voyage were due to the representative of a seaman, hired *for the whole voyage, at* 30 *dollars per month,* and who died when it was only half performed. The decision was grounded on what was understood to be usage of the *English* Admiralty, and the decision in the laws of *Oleron.* But, afterwards, in *Natterstrom* v. *Smith,* (2 *Hall's L. Jour.* 359.) the District Court of *Massachusetts,* after an able and learned review of the marine law, dismissed a claim for wages of a seaman beyond the time of his death, *when the engagement was by the month.*

These cases are not exactly analogous to the one before me, but my object is to show the spirit and liberality of the marine law on the subject.

*Cleirac*, in his commentary on the Judgments of *Oleron*, (*Judgmens d'Oleron*, art. 7.) mentions, that the *Spaniards*, in their *West-India* trade, had a custom, that if a seaman fell sick, he must provide a substitute or lose his wages; but that by the ordinances of *Charles 5th*, if a seamen died on the outward voyage, his representatives were entitled to a moiety, and if on the homeward voyage, to his entire wages; and he says, this was according to the *Consolato del Mare*. By the provisions of that celebrated Code, if a mariner died on his outward voyage, his heirs were entitled to a moiety of his wages, and if he had received all his wages before his death, his heirs were entitled to retain the whole. (*Consulat de la Mer, par Boucher*, ch. 129.) The ordinance of *Lewis* 14th, (art. 13. and 14. *des Loyers des Matelots*, and *Valin, Ibid.*) makes the discrimination already alluded to, when a seamen dies, between an engagement by the month, and for the voyage, and gives only rateable wages in the first case, but entire wages in the latter, if he dies on the return voyage. There is another part of the 14th article of the ordinance, quite applicable, in principle, to the point before me. If the seaman engages for a proportion of freight or profit, his entire portion shall be recovered by his heirs, provided he died after the voyage was commenced. "And can it be just, that the seaman who dies shortly after the departure of the ship, and has rendered very little service, should take the same portion of the freight or profit that he would have been entitled to, if he had served out the voyage?" To this question, *Pothier* answers *du Louage des Matelots*, No. 193.) that he would not have received but such a proportion of the freight or profits, as a compensation, however inadequate, for his services, though accidents had prolonged the voyage for a great length of time, and it is therefore reasonable, that his heirs should receive the entire part when his term of service has been abridged by his death.

If in addition to these liberal usages of the marine law, and which, I apprehend, are to be met with in the maritime law of all commercial nations, we attend to the special circumstances of this case, and consider that the entire services of the voyage have been rendered by the supercargo, and his agents, competently and discreetly selected by him; that they acted under his appointment, and looked to him exclusively for payment; that they conducted the voyage to a prosperous issue, by which a large profit was produced to the defendant; that he approved of their conduct, and never questioned either the necessity or wisdom of the substitution; and that he had since intimated that a commission was due, there can scarcely remain a doubt, under all these considerations, that the plaintiff is entitled, *ex æquo et bono*, to the stipulated compensation.

But the plaintiff claims, not only the compensation mentioned in the instructions, but, also, the two and a half per cent. on the sales of the wine, in pursuance of the agreement of the 5th of *August*, 1807, between *Phelps, Page, & Co.*, and the testator. This agreement was according to the allowance contained in the first proposals of the defendant to *Phelps, Page, & Co.*, of the 27th of *December*, 1806, and their answer of the 14th of *February* following. It was an allowance which the defendant had procured for and in the name of the supercargo for the voyage in contemplation, and before he had selected the testator for that trust. It was, in the first instance, under his control, and for his benefit. He had a right to make such contract as he pleased, with the future supercargo, in respect to the compensation he was to receive; and I am inclined to think that the testator could claim no more, or other compensation for his services, throughout the voyage, than what is specified in the instructions. The language of the instructions is very precise, and the two and a half per cent. there allowed, must be understood as including all the commissions of the supercargo. Those

commissions were to arise *Out of the proceeds of the out-*
*ward cargo ;* and it is not to be supposed that a further
commission of two and a half per cent. on the sales of the
outward cargo, was in contemplation.   The silence of the
instructions on that point, and their express and precise
declaration of what was to be the nature and amount of the
compensation, preclude any such inference.

I am of opinion, therefore, on this point, that the de-
fendant is entitled to the credit which he claims by his an-
swer, of 1,230 dollars, as being part of the *profits* of the
voyage.

2. The next point in the case is, whether the plaintiff
is entitled to recover the amount insured by the policy,
cancelled by the defendant without authority.

There is some difference of opinion between the par-
ties, as to the origin and motive of the insurance on the
testator's life.

The defendant says he was desirous of being indemnified
for his advances on account of the testator, by an insurance
on his life, as well as on his commissions; and that he, ac-
cordingly, suggested it to the testator, who acquiesced, and
told the defendant, before he sailed, that he had applied
for that purpose to the agent of the *London Insurance Of-*
*fice.*    A witness, (*James B. Murray,*) present at the
conversation between the defendant and the testator, says,
the sum was not exactly fixed, but it was mentioned to be
between 2 and 3,000 dollars ; and that it was understood
between them, that *the testator was to fix the sum at the*
*agent's office, and the defendant to pay the premium.*

On the other hand, it is in proof by another witness,   *G.* being a-
(*George W. Murray,*) that as a friend to the testator, he first   bout to proceed
on a distant voy-
suggested to him a policy on his life, for the benefit of his   age, ordered *in-*
*surance* to be
made on *his life*
to the amount
of 3000 pounds sterling, and *M.* undertook to pay the premium and have the business comple-
ted, and his agent in *London* obtained a policy for that amount, and paid the premium for one
year. *M.* afterwards alleging there was a mistake in the order, without the knowledge of *G.*
procured the policy to be cancelled and the premium returned, and another policy to be exe-
cuted for 450 pounds sterling.   *G.* having died within one year, *M* was held to be responsible
to his legal representative for the amount of the original policy, which had been so cancelled,
deducting the premium.

1817.

GRAY
v.
MURRAY.

family, and he went with the testator to the agent's office, where orders for the insurance were given. That he promised the testator, the day he sailed, to see that the policy was completed, *and to take care to have the premium paid.* That after the ship had sailed, he informed the defendant, that the testator had ordered an insurance on his life, to which the defendant replied, that he would write to his correspondents in *London,* that if the risk was taken, to *complete the insurance according to the orders of the testator, and to pay the premium,* provided the witness would agree to leave the policy in his hands.

The orders given by the testator are in proof, and the amount of the insurance was three thousand pounds, sterling, written at large, and repeatedly, by the testator. He declared, therein, his object to be, to secure to his wife and children, in the event of his death, a certain sum, and that when the terms were known, the agent of the office was to communicate with *George W. Murray, who was authothorized by him.* All this appears by the testimony of *Charles Murray.*

We cannot possibly be mistaken as to the great and leading motive of the testator, in procuring an insurance on his life, nor can we be mistaken as to the amount of the sum which he intended to insure. It is very clear, also, that when the defendant, afterwards, undertook to cancel this policy, on the ground of mistake in the sum intended by the testator, he assumed a fact which did not exist.

The defendant professed to act, throughout the whole transaction, under the impression that the testator had no other object in ordering the insurance, than the defendant's indemnity for the advances which he might make. In this he was, also, mistaken. That indemnity might have had some influence with the testator, but his governing motive, according to his own solemn declarations, and according to the testimony of *G. W. M.,* was of a higher, more pressing, and more interesting nature, since it was to secure

some provision for the future support of his wife and children. I think the conduct of the defendant shows very strongly, that the life insurance was not explicitly and precisely understood, at the time, to be solely or principally for his indemnity. On the first of *July*, (the day of the departure of the ship,) he writes to his *London* correspondents, to have insurance effected on the supercargo's commissions, to secure his advances. Why omit at that time any mention of the other policy? The testimony of *George W. Murray*, shows, that it was *after* the testator had sailed; and when he mentioned to the defendant the orders which the testator had given, that the defendant proposed to take the business into his own hands, and to pay the premium, provided he could have the policy as a security. He accordingly writes to *Mullett & Co.* on the 15th of *July*, that as a further security, the testator had forwarded orders to insure his life, and he directs them to complete the business, and take the policy into their hands, and adjust the premium, and charge it to him.

The witness, *George W. Murray*, was under engagement to the testator to pay the premium; and this interference and assumption of the business, by the defendant, was voluntary, and to answer his own purpose. Having undertaken to do the business, in pursuance of the orders of the testator, in the stead of *George W. Murray*, he was bound to do it well and faithfully, according to those orders; and having performed it, he was concluded and bound by the act of performance.

The orders of the testator were received and accepted at the *London Pelican Office*, and the insurance made, the policy delivered, and the premium duly paid by the agents of the defendant, in pursuance of his letter of the 15th of *July*. All this is proved by the three witnesses, in *London*. (*Charles Murray, Jenkins Jones, and Frederick Mullett.*) It became, then, a complete and executed contract. The

1817.

GRAY
v.
MURRAY.

right was vested and fixed, and there was no error or mis-take in the case.

The next part of the history of this case relates to the act of cancelling the policy, by the directions of the defendant.

The answer states, that on the 7th of *November*, and be-fore any reply was received from his *London* correspond-ents, the defendant went, with *George W. Murray*, to the agent's office in *New-York*, and there discovered that the testator had insured his life, to the amount of 3,000 pounds, sterling; and that an answer, favourable to the application, had been received. He states, further, that not knowing that the testator had any other object beyond the defendant's indemnity, and deeming the premium high and consider-ing it would be for the interest of the testator, he ordered the insurance for 2,000 dollars only. It appears, also, by his letter to his correspondents, of the 7th of *November*, that he ordered 450 pounds, sterling, to be insured, and drew for the premium, and directed them to hold that policy, and the one on the commissions, for him.

It is a little singular that in this letter, as well as in the one to the plaintiff, of the 13th of *November*, the defend-ant was silent as to the amount of the insurance in the orders of the testator, and which orders he knew had been accepted. His answer does not pretend that the sum named by the testator was contrary to any contract or understanding between them, but only that, as the pre-mium was high, and as he did not know that the testator had any object beyond the defendant's interest, he thought it for *the interest of the testator*, to reduce the policy from 3,000 pounds, sterling, to 450 pounds, sterling.

He says that he did this with the advice of *George W. Murray*. Whether he did, or did not, is immaterial, for the contract of insurance had passed, at that time, beyond the power of recall, by either of them. But *George W. Murray* declares, that he gave him different advice. When

the defendant told him the sum was so large, that he was sure it was a mistake, and talked of cancelling the policy, the witness advised him to have reference to the original order of the testator, before he took any step. But the defendant waited for no such reference, and he, afterwards, told the witness, that he had taken upon himself to cancel the policy.

It appears, that on the 17th of *November*, he received the answer of his correspondents to his letter of the 15th of *July*, in which they state, that the testator had directed an insurance to 3,000 pounds, and that the office had accepted the risk, and that they had paid the premium, and charged it to him. Then follows his reply of the 19th of *November*, declaring that the policy for 3,000 pounds was *a mistake*, and must be returned *in toto*, and no further sum to continue than 450 pounds; and his letter, also, to the plaintiff, of the 10th of *December*, announces to her the mistake, and his conviction of it. This last letter to the plaintiff, shows that the defendant assumed a very bold and arbitrary controul over the policy of her husband, and without regard to any interest but his own. He tells her, he understood that her husband only contemplated insuring 2,500 dollars, and that 2,000 *dollars would cover his advances;* and that *he took the liberty of acting as he thought best for the interest of her husband,* and had limited the sum to 2,000 dollars, and had directed the first policy to be cancelled.

The policy was, accordingly, cancelled under his orders, and by his agents, *Thomas Mullett & Co;* and it was consented to be cancelled, and the premium returned by the *Pelican Insurance Office,* under the impression and belief communicated to them by the defendant, that the 3,000 pounds had really been mistaken for 3,000 dollars. But if the mistake had existed, why did the defendant depart from the testator's intention, and reduce the policy from 3,000 to 2,000 dollars? His interference with the con-

1817.

GRAY
v.
MURRAY.

tract of the testator, was not only without authority, but it appears to me to have been rash and unjust.

In the close of the correspondence on this point, by the letter of *Thomas Mullett & Co.* of the 22d of *December*, they state that they had corrected the alleged mistake, and obtained the consent of the Insurance Office to cancel the 3,000 pounds policy. But they observe, by way of rebuke, that it was "rather singular" the defendant had never before mentioned "the sum."

By this interference, on the part of the plaintiff, to procure the destruction of a valid and executed contract, I think he has substituted himself for the insurers, and is answerable to the plaintiff for the value of the original policy, after deducting the premium. The pretence of fraud in the testator, by representing himself as sound, when he was not sound, is an inadmissible defence. The answer of the defendant states, that the health of the testator was indifferent when he sailed, and the defendant doubted of his life; yet we hear of no scruple, or objection, on this ground, when the defendant was urging the testator to have his life insured, and when he was himself an assumed agent to effect it. If the health of the testator was sufficient for a policy to indemnify the defendant, it was ffisucient for a policy to provide for his own family. The defendant was, at least, duly apprized of the state of the testator's health, and he, in the character of a substituted insurer, is bound by his own knowledge. But there is no sufficient evidence of the fact, that the testator was of an unsound constitution. The momentary indisposition and despondency mentioned by *James B. Murray*, is of no material consequence.

As to any supposed acquiescence on the part of the plaintiff, and binding on her, it is evident that she assumed the statements of the defendant to be correct. It is a well established, as well as a most reasonable principle, that to constitute a confirmation, the party confirming must be

fully apprized of his rights. (*Cann* v. *Cann*, 1 *P. Wms.* 732. *Roche* v. *O'Brien*, 1 *Ball* and *B.* 339.)

I shall, accordingly, decree, that a reference be made to a master, to take and state an account between the parties, and that in taking such account, the defendant be charged with the commission of two and a half per cent. and with the reasonable expenses and disbursments of the testator on the voyage, and with the five per cent. or one twentieth of the nett profits, according to the tenor of the allowance mentioned in the letter of instructions from the defendant to the testator. That the defendant be credited with the commissions of two and a half per cent. on the sales of the wine, to 1,230 dollars, and that these commissions be considered as constituting part of the nett profits of the voyage, at its termination. That the defendant be charged with the amount of the policy in the pleadings mentioned, for 3,000 pounds sterling, with interest thereon from the time that the knowledge of the testator's death was received by the defendant, and be credited with the premium thereon, to 254*l.* 5*s.* That in stating the said account, no notice be taken of the subsequent policy which the defendant procured without authority. That the proofs already taken in the cause, be received as evidence before the master, and that the question of costs, and all further questions, be reserved, until the coming in of the report.

Decree accordingly.